Good morning. I am Danielle Castleman from the Law Offices of Gary Castleman, Counsel for Appellant Mr. Drakeford. While we're on the topic of qualified immunity, that is also the issue... You have a very nice voice, but we can hardly hear you. Okay. Qualified immunity is also the subject of this appeal. And in our case, we are arguing that qualified immunity was erroneously granted because when the Court conducted the two-step inquiry, it answered both questions in a way that mandated a finding against qualified immunity. In this circuit, there are two levels of inquiry. The first one is, was the constitutional right violated? Yes, the Court found that Mr. Drakeford's Fourth Amendment rights were clearly and egregiously violated in this incident. The Court considered the nature of the incident that he was involved in. He was a completely innocent person just present at a bank in Orange County when he was subjected to a 960 X-ray, a felony stop involving multiple police units, armed officer pointing guns at him, ordering him out of his vehicle and prone on the ground, handcuffed, placed in a police vehicle. His vehicle was then searched. The quantum of information that the police had did not amount even to reasonable suspicion against Mr. Drakeford, let alone probable cause to arrest him in this fashion. So the Court found that his Fourth Amendment rights were violated. If the Court finds no constitutional violation, the qualified immunity inquiry ends. But in this case, because they found a violation, the second level of the analysis takes place, which is, was there clearly established law at the time that the events took place to put a reasonable officer on notice that his conduct was unlawful? The Court also answered that question in the affirmative. Yes, at the time that this incident took place, there was clearly established law that arresting somebody based on the vague description in a police bulletin violates the constitutional rights of that person. The Court noted particularly the case of Washington v. Lambert, which is nearly identical in fact to our case. Having found that both levels of the qualified immunity analysis, the first level, the constitutional violation existing, and the second level, having law on point which predated the subject incident by at least five years, qualified immunity should not have been granted in this fashion. What we believe happened, even though the Court found the egregious violation, even though the Court found that a reasonable officer in the position of the defendants would know that their conduct was unlawful, instead of concluding this analysis by denying qualified immunity to the deputies, the Court said, well, but if we're not going to paralyze the police, then we will grant qualified immunity in this case, and we're contending that this is a legal error. Once you conduct the two-step analysis and you make those findings, one, of the constitutional violation, and two, that the law was clearly established giving notice to the deputy, you cannot do that. You cannot inject the subjective component of the fear of paralyzing the police. That's why the second step of the analysis takes care of this concern. Should we give leeway? Should we not hold the officers liable if there is a gray area, if they're not sure how the law applies to the circumstances that they were facing? At the time the stop and detention of your client occurred, prior to that, there had been a series of bank robberies in the general area? Yes. Yes. Yes. That's correct, right? Yes, that is correct. And that these bank robberies had been carried out by a group of two to four African American males, age 16 to 25? That's partially correct. And your client is an African American male? Yes, he is. And he's 27? Yes. He was at the time of the incident, yes. What information, regardless of whether it was accurate or not, what information did these deputies have at the time they stopped your client's vehicle? Okay. The information that was provided by the officer that made the observation. He called the 911 dispatcher and he said words to the effect, quick, write this license plate down. And he described the person that he was concerned about to be a male black in a gold sedan vehicle with dreadlocks and a do-rag and red shorts. Mr. Drakeford, of course, was not at all like that. He was an African American person. He was dressed professionally. He was driving a black SUV. And he happened to be at the bank. Had a shirt and tie on, didn't he? He had a white shirt and a tie, yes. And an employee's identification badge. Yes, his badge was clipped to his pants in plain view. Again, regardless of whether the information was in fact accurate or not, what did these deputies know when they stopped your client's vehicle other than what we've already discussed? How did they happen to focus? Did they just randomly pick his vehicle or what? No. At some point during the transmission, Deputy Barr was having a conversation with the dispatcher where he relayed the first part of his concern was about the man in the gold Nissan. At that time, without any basis, the dispatcher sent out all those units. Then Mr. Barr, Deputy Barr, continued relaying information. He issued the 911 operator, and I don't know if it was a male or a female. Female. The dispatcher in this case issued what's called a BOLO, be on the lookout for. Well, no, not exactly. The BOLOs were already, those were bulletins that were already. You need to get near the. Yes, sorry. The BOLOs were bulletins that were talking about the series of robberies in the Orange County. That's what you were talking about, you know, the African-American person in groups driving that certain kind of a vehicle. They had. What information, whether it was accurate or inaccurate, in fact, caused the deputies to stop your client's car? Part of the broadcast was there is a second subject in a black expedition. That was the only fact that relates to Mr. Drakeford that was broadcast to the deputies. A second subject in this particular vehicle. The only information. Expedition is an SUV. It's a black SUV, yes. What was your client driving? I believe he was driving a Ford Explorer. I'm not clear whether they said. But it was a black SUV. Yes, it was a black SUV. In this entire equation of information relayed from the person who made the observation to the dispatcher, the only fact that remotely connects Mr. Drakeford with anything is a second subject in a black SUV. That information alone forms no basis for reasonable suspicion, much less probable cause for an arrest. If the person that was stopped had been the person in the gold Nissan, it's arguable that even they could arrest him in that manner. Perhaps only reasonable suspicion for a detention, but certainly not probable cause to arrest him. Mr. Drakeford is even farther removed from any suspicion. He's an innocent person in the bank. He has no idea what's about to happen to him. Were they stopping all black SUVs driven by African-American men? I'm not sure. Do we know what caused them to focus on your client? Yes, it was during the broadcast, during the 911 conversation. After he had told the dispatcher, the person I'm really concerned about is the man in the gold Nissan. Make sure somebody's sitting on that. He says, almost as an afterthought, there is a second subject in a black expedition. There was also some kind of a comment that when Mr. Drakeford was seen exiting the bank, carrying a piece of paper in his hand, he nodded to another black person who was there. And that caused Mr. Barr to think that he might be casing the bank. However, in the dispatch that he did about what he observed, he never said that. He never said there was a robbery. There was no crime reported. He basically called the dispatcher to say, this man in the gold Nissan with dreadlocks and a do-rag, he reminds me of somebody in a bulletin, but I don't even know what the bulletin is for. We don't have to guess what happened there. The officer who provided the dispatcher with the information about a possible second subject in a black-colored SUV vehicle, do we know when he gave that information to the dispatcher whether he was talking specifically about your client? No, I don't know that for a fact, but the inference is yes. Yes, it could have been him. He sat out in front of the bank. He was on the telephone. He went into the bank, and he came out and authentically nodded to somebody, and he took off in his black SUV. It could have been. It's not very clear. If he was in the car talking on the phone, then he went into the bank, then he came out. These were all things that were in the bullet, right? I'm sorry? These were all things that were in the bullets. But they did talk on the phone. They communicated with each other during the robberies. Yes, but the bulletins, I believe the record has four or five of those beyond-the-lookout bulletins. And they describe people of various ethnicities, various ages, various heights, various vehicles. There's nothing in the BOLO that specifically says look out for this kind of person, tall, young, African-American, driving only this car. I believe during the hearings in the summary judgment, Judge Selma said virtually any person between those ages driving along the I-5 freeway would have been suspect under the BOLO. There was absolutely no specificity. It was a very, very general description. What you have beside the BOLO is a description of the off-duty officers to what's going on. Exactly. But the focus of his concern, and he made that very clear in the dispatch, was the man in the gold Nissan with dreadlocks and a do-rag and red baseball shorts. Mr. Drakeford. I know what a do-rag is. It's a piece of cloth tied on your head. I don't think it's just a bandana. I think it's more like a Lycra type cap. Mr. Drakeford did not match that description in any way. Completely different attire, lifestyle, vehicle, has no relationship with the suspect whatsoever. The information provided the dispatcher, though, did not connect the description of the individual in the gold Nissan to the description of the second suspect in the black SUV, right? No, no. The information provided, those were two separate things. The only information that was passed along that had any remote connection with Mr. Drakeford was there is a second subject in a black SUV. There is a second suspect in a black SUV. There is a second subject. Okay, subject. Subject. So nothing in his conduct or in his description justifies any suspicion whatsoever, not even for a Terry type stuff, let alone for a full-blown felony arrest that he was subjected to on that date. And we believe that by finding the Fourth Amendment violation clearly and egregiously and finding that the law in existence at the time would have put a reasonable officer on notice that arresting a person under those circumstances was unlawful, logically and legally mandates a finding against qualified immunity. You cannot inject the subjective component of fear of paralyzing the police. That is already taken into account in the second step of the analysis. Let's be careful not to make judgments here. Let's give the police the leeway that they need. Let's not hold them liable when the area of the law is not clear or when they can reasonably make a mistake. That was already addressed in the second level. Regarding the second issue right now is the Monell cause of action. The court granted summary judgment for the defendants on this cause of action as well, and we believe there was an error in the analysis. The court focused primarily on two issues, one having to do with a policymaker, an actual policymaker with final authority enacting the policies that we argued were unconstitutional in this case. It is our position that it is not necessary that the policy be enacted or carried out by an actual policymaker with final authority when there is delegation. We believe there was a delegation here to a person who became a de facto policymaker. Pardon me. The fact that the department could deploy these 960 x-rays in this manner when probable cause was clearly lacking based on insufficient information where the dispatcher takes it upon herself to make these decisions when she's only supposed to make notifications. We believe that by delegating this immense power to the dispatcher, the county cannot insulate itself from liability by saying, oh, we didn't do it, it was this other person, we don't have anything to do with it. I think the court erred in insisting that a formal policymaker with authority be involved. In this case, because of the delegation, that is not necessary. We cited case law for that proposition that a lower employee can be deemed a policymaker when they are entrusted with these kinds of decisions. I want to save some time. Okay. Thank you. Good morning, Your Honors. David Lawrence for the defendants, 16 of them in all. What I would like to do first is address the issue on the cross appeal that we brought on behalf of the defendants, and that has to do with the appellant's 11th cause of action for negligent arrest. It's clear in the complaint that it's pled as a negligence cause of action, and this court has held in Martinez v. City of L.A. long ago that Government Code Section 821.6 precludes liability for a negligent investigation leading to an arrest. In reading from that opinion, this was a case where a gentleman was suspected of murder, there was a warrant issued in Mexico, he was held there for a period of time, and it was determined he was not the correct person, and the LAPD officers were sued on a variety of theories, one of them being negligent arrest. And this court said, quote, Martinez bases his state law negligence claim on the same facts as his false imprisonment claim, grounded upon his alleged false arrest, and his false imprisonment claim grounded upon his alleged prolonged detention. With regard to the false arrest claim, Martinez contends the LAPD officers acted negligently in their investigation, and this led to his arrest. We reject this contention. The same immunity which protects officers from malicious prosecution protects them from liability for a negligent investigation which leads to an arrest. That case resolves the 11th cause of action. There's simply no basis to proceed on that. As far as qualified immunity is concerned, first of all, we're not debating here today whether there was probable cause to arrest or reasonable suspicion. The district court found there was not probable cause, and it was not a Terry stop. What we're debating here today is whether or not the individual defendants are entitled to qualified immunity. And district court Judge Sellman did exactly what he was required to do, and he stated, quote, the doctrine will turn on a particularized showing for each participant. And if you look at his ruling on qualified immunity, he was very particular. He looked at each individual in the process and decided whether that person was entitled to qualified immunity. Now, my opposing counsel says there are two prongs to qualified immunity. I submit that she is incorrect on that. It's a three-prong analysis. First, the court is to look at whether on the facts alleged there is a constitutional violation. Judge Sellman found that there was. Secondly, the court is to look to whether the law is clearly established, and he found that it was. But there's a third prong, and that is in light of clearly established law, could a reasonable officer believe that what he or she did was lawful? Now, this was the basis for the finding of qualified immunity, with the exception of the dispatcher. Judge Sellman found that there was no clearly established law relating to her conduct and granted her qualified immunity on that basis. Now, Washington v. Lambert has been cited by appellants as controlling in this case, and I think it's interesting to look at that case because in many ways it was similar to this case, except that there were many dissimilarities as well. For instance, the defendant in that case, LAPD Officer Lambert, simply saw two African-American men in a fast food restaurant and thought that they fit the description of two individuals who had conducted some robberies. Based on that information alone, other officers responded, they arrested, they did much of what happened in this case, which is prone the man out, handcuff him, et cetera. Actually, there were two suspects in that case. And what happened is in the district court, the district court granted qualified immunity to everyone except Lambert, who was the one who made the initial observations and conveyed the information. And in that opinion, the court states, quote, the judge granted qualified immunity as to the other officers on the ground that Lambert was the lead officer and the others had reasonably relied on his orders in carrying out the investigatory stop. So even in that case, the only person to whom qualified immunity was denied was the individual who made the initial observations. That person in this case is Officer Sergeant Barr. Sergeant Barr made the initial observations, even though he was off duty. We have the transcript of what he conveyed on the 911 call to the department. We have the transcript of the dispatch. What separates Sergeant Barr from Mr. Lambert in the Washington case is that he had a great deal more information than did Officer Lambert in the Washington case. And secondly, he did not participate in the arrest. He simply conveyed the information to the 911 operator. She conveyed it to the dispatcher. They put it out over the radio, and deputies responded. And given the information they had, Judge Salma found that they acted reasonably. Now, in terms of the information, the court was asking how the information acted. Well, let me back up. There seemed to be some question as to whether the plaintiff was, in fact, the person observed by Sergeant Barr in the parking lot. And there's no question about that. The record is clear that Sergeant Barr actually pointed out the vehicle as one of the deputies was coming to the parking lot. And the court can find that information in the supplemental excerpts of record at page 395. So there's no question about whether or not Mr. Drakeford was, in fact, the individual observed by Sergeant Barr entering the bank, using the telephone, nodding to the other individual, and leaving in the black SUV. In terms of the Monell issue, there certainly is no delegation of policymaking authority here. If the court were to find that the dispatcher is a policymaker based upon each and every decision that he or she makes, that would simply do away with Monell liability. Officers in the field make decisions based on their own discretion. You couldn't find a job in the county where people don't make discretionary decisions, but that does not mean that they're making policy. Unless there are any questions, I would reserve the rest of my time to rebut the appellant's argument to the cross-appeal. Thank you. Martinez, the case of Martinez, does not, it's not important really here for the discussion of negligence. The 11 cause of action clearly states that the defendants are being sued for a breach of confidentiality. A breach of their duty of due care in conducting their law enforcement duties. This is not about a negligent investigation, as it was in Martinez. The event that, where the complaint comes from is not an investigation. There was no investigation. There was a full-blown felony arrest. We cannot talk about investigation. If you, in order to believe that this is an investigation, when you look at the incident, you have to see that as an investigation. And there was no investigation. There was immediately a full-blown arrest. That's why Martinez is not controlling in this case. And the reason why this cause of action should, summary judgment should not have been granted in this cause of action is because government code section 820.4 clearly states that conduct which is a breach of due care is not immunized. Our cause of action, the 11 cause of action for negligence, is a breach of the standard of due care. It's not an intentional tort. It is purely negligence. The analysis is very simple. There are no other immunities such as the immunity for malicious prosecution. There is no malicious prosecution. There is no investigation. It's simply a breach of due care. Several paragraphs of the cause of action describe what this breach of due care was in the exercise of their law enforcement duties. How long was your client detained? It's not clear, but it's agreed it's between 15 and 40 minutes, the entire duration of the incident. If he had been detained for five minutes, would you still have a cause of action? I think it depends. I think it depends. I think courts are really, you know, they disagree with that. I mean, the same thing, squad cars, boxing men, keys out of the car, lie on the ground, guns pointed, handcuffed, but they stand him up and say, wait a minute, this is a well-dressed, professional-looking individual. He's got an employee badge on here. This can't be our guy. They radio back, boom, boom, it's not him. And they let him go a minute after they put the cuffs on him. Would you still have a cause of action? Yes. I think so because of the nature of the stop with the guns and all of that. Exactly. The arrest. If they had stopped him and not done this full-fledged felony arrest, simply asked him out of his vehicle, asked him a couple of questions, handcuffed him, kept him in the back of the squad car for 10 minutes, and then cleared it, would you have a cause of action? Probably not. I think it's a matter of. From your point of view, it's the nature of the way in which and the level of force that they used when they first encountered him. Yes. Yes. But there's no. Combined with the length of detention. Exactly. But I think there is no hard and fast rule that says, well, a duration of X is this, a duration of less than X is that. I think nobody can deny that being subjected to what Mr. Drakeford was subjected to is extreme, it's traumatizing, and people would give anything not to be subjected to that for even one minute. It really is a matter of degree. I don't think it matters if it lasts five minutes or 50 minutes. The issue here really with respect to the 11 cause of action is the breach of due care. They are charged with conducting their law enforcement duties with due care. And in this case, we allege there was no due care. Martinez pertains to an investigation. It was lengthier in time. It was more detailed. In order to believe that Martinez applies, you will have to view the 960 felony stop as an investigation. And it was no investigation. Well, was the initial stop, in your view, a Terry-type stop? No, it was not. Why not? Because the intent, well, for several reasons. First of all, the 960 felony stop, by nature, is not an investigatory stop. The way the number of units that gets deployed, the way that this operation gets performed, it's extremely high risk.  The way that Mr. Drakeford is approached in order to throw his keys out the window, get down on the ground. If he moves, he knows his life is in danger. The nature of the 960 felony stop is not analogous to a Terry-type stop. Even though under Terry, there's a lot of discretion. Sometimes if you're handcuffed or you're detained for a long period of time, it can still be a detention. There's a little room there. But in this case, the nature of the stop itself is so serious. It's so high risk. It's such a priority stop that it cannot fit under Terry. Okay. Thank you. Thank you. All right. Rebuttal. Government Code 820.4 does not provide for a cause of action. And I'll read the statute in its entirety. A public employee is not liable for his act or omission exercising due care in the execution of enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment. That is a specific exception to the immunity provided in the California Government Code Section 821.6. 821.6 provides immunity for public officials carrying out their duties. And the California cases are clear. It's not simply an immunity for malicious prosecution. It's immunity for liability for the events leading up to a prosecution or some other similar type of proceeding. And the Martinez case is very, very clear. An individual can be sued under California state law for false arrest, but they cannot be sued for negligent false arrest because the exception to the immunity only provides for false arrest or false imprisonment. Thank you. Thank you. The matter will stand submitted, and this Court will recess until 9 a.m. tomorrow morning. Thank you.
judges: Pregerson, Hall, Hawkins